UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUL 18  PM 2: 54

CLERK

BY_____L4W_____
DEPUTY CLERK

JOHNATHAN MATSON,          )
                          )
        Plaintiff,         )
                          )
    v.                     )      Case No. 2:14-cv-183
                          )
CATHY CAPPETTA,            )
                          )
        Defendant.         )

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 37)

Pursuant to 42 U.S.C. § 1983, Plaintiff Johnathan Matson alleges that Defendant Cathy Cappetta ("Trooper Cappetta"), a Vermont State Police ("VSP") Trooper at the time, subjected him to a false arrest in violation of his Fourth Amendment right to be free from unreasonable seizures and his Fourteenth Amendment right to due process of law. Mr. Matson's claim arises out of his arrest on August 16, 2011 for violating a Relief from Abuse Order ("RFA") issued in favor of his estranged wife. Pending before the court is Trooper Cappetta's motion for summary judgment (Doc. 37), which Mr. Matson opposes. After oral argument, the court took the motion under advisement on June 21, 2016.

Mr. Matson is represented by Brian R. Marsicovetere, Esq. Trooper Cappetta is represented by Vermont Assistant Attorney General David R. McLean.

## I.    The Undisputed Facts.

On August 5, 2011, Carey Stoudt filed a complaint in the Family Division of the Vermont Superior Court (the "Family Division") for a RFA against Mr. Matson. The Family Division granted her request (the "August 5 RFA"), and restricted communication between Mr. Matson and Ms. Stoudt to communication for the purpose of arranging parent-child contact between Mr. Matson and their children. Mr. Matson was also

ordered to maintain a three-hundred foot distance from Ms. Stoudt and their marital residence. The August 5 RFA specified that a hearing would be held on August 9, 2011, and stated that "[t]he temporary order remains in effect until the court dismisses the case or, after a hearing, issues an order or denies a final order, or at 5:00 PM on the date of hearing, whichever is earlier." (Doc. 37-3 at 3.) On August 5, 2011, Mr. Matson was served with the August 5 RFA.

On August 8, 2011, Mr. Matson was charged in the Addison Criminal Division of the Vermont Superior Court (the "Vermont Criminal Court") with five misdemeanor counts of violating the August 5 RFA. The court issued conditions of release, which Mr. Matson signed (the "CORs"). The CORs prohibited him from sending more than ten text or email messages to Ms. Stoudt within a twenty-four hour period and limited his in-person contact with her to dropping off and picking up their children at the VSP barracks.

On August 9, 2011, the Family Division issued an "Extended" RFA (the "August 9 RFA"). (Doc. 37-6 at 2.) The August 9 RFA provided:

> [Mr. Matson] shall not telephone, write to, . . . contact . . . [Ms. Stoudt] . . . in any way, or attempt to communicate directly or indirectly with him/her/them through a third party or in any other manner, except that [Mr. Matson] may: communicate w/ [Ms. Stoudt] via email + text messaging + in person contact is permitted to exchange the children + @ school + sport events/public activities for the children[.]

*Id.* The August 9 RFA also ordered Mr. Matson to refrain from stalking, threatening, or harassing Ms. Stoudt. It permitted him to retrieve "agreed upon items from the marital residence" in the company of law enforcement or a third party. *Id.* at 3. The August 9 RFA stated that it remained in effect "until the court dismisses the case or, after a hearing, issues an order or denies a final order, or at 5:00 PM on the date of the hearing, whichever is earlier." *Id.* It indicated that a hearing was scheduled for August 30, 2011. On August 9, 2011, Mr. Matson was served with the August 9 RFA.

On August 12, 2011, the Vermont Criminal Court issued modified conditions of release (the "August 12 Modified CORs"), which prohibited Mr. Matson from having any contact with Ms. Stoudt, except that he was permitted to send ten text or email messages

2

to her within a twenty-four hour period. The August 12 Modified CORs additionally
ordered Mr. Matson to abide by all Family Division orders, including RFAs.

On August 14, 2011, Ms. Stoudt sent Mr. Matson a text message inquiring
whether he would be at the VSP barracks the next day to exchange their children. Mr.
Matson did not reply. The following morning, Ms. Stoudt sent him another text message,
stating, "I do not want to bring them if you will not be taking them. I do not want them
to be disappointed again." (Doc. 37-8 at 2.) Mr. Matson sent Ms. Stoudt the following
text message in reply:

> Disappointed that they got to spend time with Nana and Liz? . . . I was
> trying to be nice. How were they disappointed? I am sorry I made the
> wrong choice to bring my boat down here . . . & spend time with friends,
> away from the nightmare my life has become up home. I mean, I don't
> even get to be in my home right now. I can't even play with my kids in
> their back yard that we created for them. I cannot sleep through the night.
> I am tired, scared, hurt and do not understand, and I can't even
> communicate with you. I've been trying just to talk for so long, but have
> been unable. I am sorry, but please do not send me messages that make me
> feel guilty. Please try to understand what I am going through. Please look
> out the window . . . and ask yourself what would you do with our 3 children
> in my tiny 1 bedroom apartment. I wish I would have had a little more time
> to find a place that was bigger and affordable, but I did not, I am sorry.
> Please tell the kids I love them, and I love you too.

*Id.* Ms. Stoudt informed Mr. Matson by text message that he was violating "the family
court order and RFA, that clearly says contact only regarding kids and possessions[,]"
and that she would "have to report the violations." *Id.* Mr. Matson responded that his
attorney had advised him that there were no longer any content restrictions on their
communications. Ms. Stoudt explained that her attorney had advised her to the contrary,
and stated, "No communication with me unless it is about the kids[,]" to which Mr.
Matson replied, "Crystal Clear, thanks." *Id.*

3

Mr. Matson nonetheless continued to send Ms. Stoudt text messages, some of which concerned their children and some of which concerned their vehicles.[1]  On August 15, 2011, Ms. Stoudt called the VSP to report that Mr. Matson was violating the terms of a RFA.  Trooper Cappetta responded to Ms. Stoudt's call and obtained a signed, sworn statement from her.  In her statement, Ms. Stoudt averred that "[s]ince last Monday August 8th when [Mr. Matson] was released from jail for violation [of] a tempor[ary] rfa he has continued to have contact with me that did not concern the kids or possessions, violation [of] the rfa."  (Doc. 37-9 at 2.)  She described text messages sent by Mr. Matson on August 12-15, 2011, which did not concern their children, including a text message that made her "feel like he was stalking" because it referenced a truck that was parked at her home.  *Id.* at 4.  Ms. Stoudt also discussed an incident on August 13, 2011, when Mr. Matson had arrived at the marital residence to retrieve some of his possessions, and it "made [her] uncomfortable when he asked [her] to look for his fishing license w/ him in his shed telling [her] he hid [her] diamond rings and engagement ring, etc."  *Id.* at 3.  Ms. Stoudt explained that she followed Mr. Matson to the shed, accompanied by her sister, and they did not find his fishing license or her jewelry.

Trooper Cappetta obtained a copy of the August 5 RFA and reviewed it "carefully[.]"  (Doc. 43-2 at 24.)  On the evening of August 16, 2011, she arrived at Mr. Matson's residence with another officer and explained that she had received "another complaint from [his] ex-wife . . . concerning text messages."  (Doc. 37-11 at 4:29-40.)[2]  When Mr. Matson stated that the text messages were only about the couple's children, Trooper Cappetta told him that she had read the text messages and they pertained to additional matters.  Mr. Matson asked to call his attorney, and Trooper Cappetta replied

---

[1] Trooper Cappetta's Statement of Undisputed Facts contains an unopposed description of these communications: "In the following days, [Mr. Matson] continued to violate the Relief from Abuse Order in various ways."  (Doc. 37-1 at 3.)

[2] Trooper Cappetta's Statement of Undisputed Facts and Mr. Matson's Statement of Disputed Facts both refer to the video recording of Mr. Matson's arrest.  In ruling on a motion for summary judgment, the court must "allow the videotape to speak for itself" and not adopt a "version of the facts" that is "blatantly contradicted" by the video recording.  *Scott v. Harris*, 550 U.S. 372, 378 n.5, 379-80 (2007).

4

that he could do so at the VSP barracks. Trooper Cappetta then asked Mr. Matson: "So you understand what this is about, right?" to which Mr. Matson responded in the affirmative. *Id.* at 5:08-13. Mr. Matson acknowledged that the text messages pertained not only to their children, but also to his truck. Trooper Cappetta reiterated that she had reviewed the text messages, and noted they were sent during the previous week following Mr. Matson's release from jail. After Mr. Matson insisted that he "did nothing wrong[,]" *id.* at 8:04-10, and repeated his request to speak with his attorney, Trooper Cappetta permitted him to call his attorney. She then arrested him.

At the time of his arrest on August 16, 2011, the August 5 RFA had expired, but the August 9 RFA and August 12 Modified CORs were in effect. Although in his Complaint Mr. Matson alleges that he was arrested "for reasons unknown," (Doc. 1 at 2), in his deposition he responded in the affirmative when asked: "You understood that [your arrest] was with respect to [the RFA Ms. Stoudt had against you], whether or not you believed you had violated it, you knew that they were there because of that order, correct?" (Doc. 37-10 at 53.)

Trooper Cappetta subsequently determined that the August 5 RFA and August 9 RFA differed in their terminology. She consulted her supervisor and State's Attorney David Fenster, who advised her to release Mr. Matson and who stated he would consider the matter in the morning. Thereafter, Trooper Cappetta released Mr. Matson from custody.

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment must be granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

5

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

"Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Spinelli*, 579 F.3d at 166-67 (internal quotation marks omitted). There is no genuine dispute where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.   Whether There Was Probable Cause for Mr. Matson's Arrest.

Pursuant to 42 U.S.C. § 1983, Mr. Matson alleges one count of false arrest, asserting that he was arrested without probable cause in violation of his Fourth and Fourteenth Amendment rights. Trooper Cappetta seeks summary judgment, arguing that the undisputed facts demonstrate that she had probable cause to arrest Mr. Matson for a violation of a RFA. *See* 13 V.S.A. § 1030 (making it a crime to "commit[] an act prohibited by a court . . . in violation of an abuse prevention order").

"In analyzing § 1983 claims for unconstitutional false arrest, [the court] generally look[s] to the law of the state in which the arrest occurred." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (internal quotation marks). Under Vermont law, the existence of probable cause is a complete defense to a false arrest claim. *See Kent v. Katz*, 312 F.3d 568, 573 (2d Cir. 2002) ("A § 1983 claim of false arrest based on the Fourth Amendment right to be free from unreasonable seizures may not be maintained if there was probable cause for the arrest. It appears to be undisputed that this principle applies as well to a claim of false arrest under Vermont law."); *see also Grega v. Pettengill*, 123 F. Supp. 3d

517, 548 (D. Vt. 2015) ("Probable cause is a complete defense to a constitutional claim of false arrest . . . under both Vermont and federal law.").

Probable cause "exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Steppello*, 664 F.3d 359, 363-64 (2d Cir. 2011) (internal quotation marks omitted). The existence of probable cause is an objective inquiry that "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest[.]'" *Jaegly*, 439 F.3d at 154 (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

When determining whether a warrantless arrest was supported by probable cause, a "court must consider only those facts available to the officer at the time of the arrest and immediately before it." *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (internal quotation marks and brackets omitted). "An arrest is not justified by what [a] subsequent [investigation] discloses[.]" *Henry v. United States*, 361 U.S. 98, 103 (1959); *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 253 (E.D.N.Y. 2000) ("It is . . . axiomatic that subsequently discovered evidence cannot be used to cure an arrest that was made without probable cause.").

"Probable cause does not require absolute certainty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). It also "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). Instead, "'probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)) (alteration omitted).

"Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citing *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979)). To the contrary,

7

when a police officer has the "facts sufficient to establish probable cause," he or she is required "to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989). "[W]here there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

Mr. Matson argues that he was arrested without probable cause because Trooper Cappetta relied on the expired August 5 RFA in arresting him. The court agrees that an expired RFA, alone, could not provide probable cause for his arrest. However, those are not the facts before the court.

When arresting Mr. Matson, Trooper Cappetta did not reference the expired August 5 RFA. Instead, she advised Mr. Matson that she had received "another complaint from [his] ex-wife . . . concerning text messages" and had reviewed the text messages herself. (Doc. 37-11 at 4:29-40.) Trooper Cappetta noted that the text messages in question were sent after Mr. Matson's release from jail, thereby revealing that she had some prior knowledge of the couple's ongoing dispute and its escalation into criminal charges against Mr. Matson.

In her sworn statement, Ms. Stoudt averred that Mr. Matson had been recently released from jail for a violation of a temporary RFA and that he continued to have contact with her that did not concern their children or possessions in "violation [of] the rfa." (Doc. 37-9 at 2.)[3] The text messages included Mr. Matson's statement to Ms. Stoudt that "I can't even communicate with you. I've been trying just to talk for so long, but have been unable[,]" (Doc. 37-8 at 2), which arguably constituted an admission that he understood his contact with her was prohibited. The text messages also indicated Ms. Stoudt's statement that she would report violations and that there should be no further communication unless it was about their children. Mr. Matson stated that he was

---

[3] Under Vermont law, a second RFA violation is a felony. *See* 13 V.S.A. § 1030(b) ("A person who is convicted of a second or subsequent offense under this section . . . shall be imprisoned not more than three years or fined not more than $25,000.00, or both.").

"Crystal Clear" about this restriction but continued to communicate with her thereafter about other subjects. *Id.*

In her sworn statement, Ms. Stoudt averred that Mr. Matson had made her uncomfortable when he was present at the marital residence, asked her to help him find his fishing license, and told her that he hid some of her jewelry. She further averred that when Mr. Matson referred to a truck parked at her home, he made her "feel like he was stalking[.]" *Id.* at 4.[4]

Based on her review of the text messages, Trooper Cappetta had a reasonable basis for concluding that Mr. Matson understood that a RFA was in effect and that it limited his communications to those regarding the couple's children. When Mr. Matson told Trooper Cappetta that his text messages were only about the couple's children, Trooper Cappetta challenged the truthfulness of this assertion.[5] Mr. Matson subsequently admitted that he had mentioned his truck in the text messages, but asserted that he had done nothing wrong. Trooper Cappetta was not required to take his protestation of innocence at face value or to investigate it further. *See Jocks v. Tavernier*, 316 F.3d 128, 135-36 (2d Cir. 2003) ("We d[o] not impose a duty on the arresting officer to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest."); *Panetta v. Crowley*, 460 F.3d 388, 395-96 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause."); *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (noting that the Second Circuit has "found probable cause where a police officer was presented with different stories from an alleged

---

[4] At the time of the events in question, Vermont law criminalized stalking even in the absence of a RFA. *See* 13 V.S.A. §§ 1061-1062. It also criminalized "aggravated stalking[,]" if a person "intentionally stalk[ed] another person, and . . . such conduct violate[d] a court order that prohibits stalking and [was] in effect at the time of the offense[.]" 13 V.S.A. § 1063.

[5] Vermont criminalizes the provision of false information to law enforcement authorities. *See* 13 V.S.A. § 1754 ("A person who knowingly gives false information to any law enforcement officer with purpose to . . . deflect an investigation from the person . . . shall be imprisoned for not more than one year or fined not more than $1,000.00, or both.").

victim and the arrestee"); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1321 (10th Cir. 2002) ("[T]he arresting officer has no obligation to believe the suspect[.]").

"An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995), *cert. denied*, 517 U.S. 1189 (1996); *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness.") (internal quotation marks omitted); *Gardenhire v. Schubert*, 205 F.3d 303, 322 (6th Cir. 2000) (holding that "a crime victim's accusation standing alone can establish probable cause"). Here, Trooper Cappetta had no reason to doubt Ms. Stoudt's veracity. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (granting summary judgment to the defendant where there was "no evidence to suggest that the officers had any reason to doubt [the victim's] veracity").

To the extent Ms. Stoudt offered legal opinions regarding Mr. Matson's actions, Trooper Cappetta did not rely on those opinions alone. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1069-70 (9th Cir. 2004) ("Law enforcement officers who act to enforce . . . a protection order . . . have a responsibility to familiarize themselves with the order's precise contents through some official source. . . . Uncritical reliance upon the legal conclusions of lay citizens . . . is not reasonable."). Instead, Trooper Cappetta reviewed the RFA, albeit an expired version of it, and the text messages at issue before deciding whether to arrest Mr. Matson. *Compare with id.* at 1063 (finding no probable cause where the arresting officers "knew nothing about the terms of the order other than what, if anything, [the alleged victim] told them").

"[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to . . . any charge actually invoked by the arresting officer at the time of arrest." *Jaegly*, 439 F.3d at 154. In other words, "when faced with a claim for false arrest, we focus on the

validity of the *arrest*, and not on the validity of each charge." *Id.* (emphasis in original).
For this reason, "a plaintiff is not entitled to damages under § 1983 for false arrest so long
as the arrest itself was supported by probable cause, regardless of whether probable cause
supported any individual charge identified by the arresting officer at the time of arrest."
*Id.* In this case, although Trooper Cappetta could not lawfully arrest Mr. Matson for a
violation of the August 5 RFA, she could arrest him for violating a RFA that both he and
Ms. Stoudt acknowledged existed and was in effect at the time he sent his text messages.

Based on the totality of the circumstances known to her, Trooper Cappetta had
probable cause to arrest Mr. Matson because she had a reasonable basis for believing he
had violated a RFA and there was thus "'a probability or substantial chance of criminal
activity[.]'" *Bakhtiari*, 913 F.2d at 1062 (quoting *Gates*, 462 U.S. at 244 n.13). The
court, however, need not rest its determination on this close question because there was
also arguable probable cause for Mr. Matson's arrest.

## C.   Whether There Was Arguable Probable Cause for Mr. Matson's Arrest.

Trooper Cappetta asserts the defense of qualified immunity, arguing that it
precludes liability for Mr. Matson's false arrest claim. Once a defense of qualified
immunity is raised, it is met with a "forgiving standard of review[] that provides ample
protection to all but the plainly incompetent or those who knowingly violate the law[.]"
*Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (citations and internal
quotation marks omitted). A police officer's conduct violates "clearly established law"
only when it is clear that "*every* reasonable official would have understood that what he
is doing violates that right." *Coollick v. Hughes*, 699 F.3d 211, 220 (2d Cir. 2012)
(internal quotation marks omitted and emphasis supplied).

Whether a defendant's conduct is objectively reasonable for qualified immunity
purposes "is always a question of law for the court." *Gonzales v. Duran*, 590 F.3d 855,
864 (10th Cir. 2009); *see also Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)
(observing that if there are no "disputed facts that are material to the qualified immunity
issue, the ultimate determination of whether the officer's conduct was objectively

11

reasonable is to be made by the court"). In undertaking this analysis, "judges should be cautious about second-guessing a police officer's assessment," and avoid examining the arrest "[w]ith the benefit of hindsight and calm deliberation[.]" *Ryburn v. Huff*, 132 S. Ct. 987, 991-92 (2012).

"An arresting officer is entitled to qualified immunity[,]" which "is a complete defense to false arrest claims[,]" if he or she "can establish that there was 'arguable probable cause' to arrest." *Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012) (internal quotation marks omitted); *see also Long v. L'Esperance*, 701 A.2d 1048, 1052 (Vt. 1997) (holding that "an arresting officer is entitled to qualified immunity" from false arrest claims if the arresting officer had arguable probable cause). Arguable probable cause "exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski*, 723 F.3d at 390 (internal quotation marks omitted).

Trooper Cappetta made a clear mistake of fact and law in reviewing and relying on an expired RFA. She did so, however, in good faith and without intending to violate Mr. Matson's constitutional rights. In such circumstances, Trooper Cappetta's mistaken reliance on an expired version of the RFA is not dispositive because "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity thus remains available when a law enforcement officer makes a good faith and reasonable determination based upon objective facts regarding whether there is probable cause for an arrest, even if that determination later proves incorrect.[6] "'[I]f

---

[6] *See, e.g.*, *Welch v. City of New York*, 166 F.3d 1203, 1998 WL 904319, at *1 (2d Cir. 1998) (summary order) ("[The officer] was never told by [the arrestee] or anyone else that an amended order of protection existed. . . . Having examined what he believed to be the governing document, [the officer] reasonably declined to examine a 'paper' in [the arrestee's] possession. In short, [the officer's] conduct was objectively reasonable and not incompetent or in knowing violation of the law."); *Valcarcel v. City of New York*, 2014 WL 4370814, at *7 (E.D.N.Y. July

12

officers of reasonable competence could disagree' as to whether probable cause existed, 'immunity should be recognized.'" *Zellner*, 494 F.3d at 367 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Here, that "forgiving standard" is satisfied. *See Zalaski*, 723 F.3d at 389.

Because the undisputed material facts reveal that there was arguable probable cause for Mr. Matson's arrest, Trooper Cappetta is entitled to qualified immunity and summary judgment must be granted in her favor.

## CONCLUSION

For the foregoing reasons, the court GRANTS Trooper Cappetta's motion for summary judgment (Doc. 37).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this ___18___ day of July, 2016.

Christina Reiss, Chief Judge
United States District Court

---

29, 2014) (finding a police officer entitled to qualified immunity notwithstanding a vacated order of protection where an alleged victim advised there was an order of protection which plaintiff had violated by coming to her home, law enforcement's computerized system did not indicate the order had been vacated, and plaintiff admitted he had gone to the alleged victim's home but advised that the order of protection prohibiting such conduct had been vacated); *Coyle v. Coyle*, 354 F. Supp. 2d 207, 212 (E.D.N.Y. 2005), *aff'd*, 153 F. App'x 10 (2d Cir. 2005) ("[E]ven if the order of protection that [the plaintiff] was arrested for violating was, as the [p]laintiff contends, null and void, probable cause to arrest can exist even when the arrest is based on mistaken information, so long [as] the arresting officer acted reasonably and in good faith in relying upon that information.") (internal quotation marks omitted).